UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPHINE KIRKLAND-HUDSON,

Plaintiff,

v.

MOUNT VERNON CITY SCHOOL
DISTRICT, *et al*.,

Defendants.

No. 21-CV-695 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Bryan Glass, Esq.
Glass & Hogrogian LLP
New York, NY
*Counsel for Plaintiff*

Gerald Stephen Smith, Jr., Esq.
Deanna L. Collins, Esq.
Silverman & Associates
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Josephine Kirkland-Hudson ("Plaintiff"), brings this Action against the Mount Vernon

City School District (the "District"), Felicia Gaon ("Gaon"), Susan Burnett ("Burnett"), Rachel

DePaul ("DePaul"), Karalyne Sperling ("Sperling"), Marcie Tiggs ("Tiggs"), and Kenneth

Hamilton ("Hamilton"; collectively, "Defendants"). She claims that Defendants discriminated

and retaliated against her in violation of 42 U.S.C. § 1981 and the New York State Human

Rights Law ("NYSHRL"); maintained a hostile work environment in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), § 1981, and the NYSHRL; and retaliated against her in

violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, et seq. (*See* SAC

(Dkt. No. 59); Pl's Mem. in Opp. to Mot. ("Pl's Mem.") 2 (Dkt. No. 116).)  Before the Court is

Defendants' Motion for Summary Judgment.  (Not. of Mot. (Dkt. No. 109).)  For the following

reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts, recounted in the light most favorable to Plaintiff, are taken from

Defendants' Rule 56.1 statements, Plaintiff's response and counterstatement, and the exhibits

submitted by the Parties.  (*See* Defs' Statement of Undisputed Material Facts ("Defs' 56.1")

(Dkt. No. 110); Pl's Counterstatement ("Pl's 56.1") (Dkt. No. 114); Defs' Resp. to Pl's

Counterstatement ("Defs' Resp. 56.1") (Dkt. No. 122).)[1]  These facts are not in dispute unless

otherwise indicated.

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit papers "includ[ing] a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  A court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence.  *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence).  "Nor may a court accept a conclusory denial in a Rule 56.1 counterstatement if the denial is not supported by admissible evidence.  *See Mae v. Quickway Ests. LLC*, No. 22-CV-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 354–55 (E.D.N.Y. 2015) (granting summary judgment where nonmoving party "relie[d] solely on his own general statements" rather than admissible evidence in disputing moving party's statement of material facts).

Defendants here lodge numerous evidentiary objections to paragraphs in Plaintiff's Rule 56.1 statement, sometimes just by invoking terms of art like "[l]ack of personal knowledge" or "hearsay."  (*See, e.g.*, Defs' Resp 56.1 ¶¶ 130, 132, 133, 143; 151, 152, 176; *see also* Defs' Reply 1–2 (restating many of those objections).)  Of course, "[t]he Court has adjudicated any [relevant] bona fide evidentiary objections a Party has raised."  *See Galgano v. County of Putnam*, No. 16-CV-3572, 2024 WL 1623401, at *1 n.2 (S.D.N.Y. Apr. 15, 2024).  However, to the extent Defendants fail to clearly identify the basis for any particular objections, the Court is

### 1. The Parties

Plaintiff is an African American woman who has been employed by the District as a Social Worker since the start of the 2005-2006 school year.  (Defs' 56.1 ¶ 2; Pl's 56.1 ¶ 2.) Defendants are several District employees at various levels in its hierarchy.  Gaon has served as the Director of Student Services since 2015.  (Defs' 56.1 ¶ 6; Pl's 56.1 ¶ 6.)  At all relevant times, DePaul was the District's Interim Director for Special Education; Hamilton was the District's Superintendent; and Tiggs was the Assistant Superintendent for Human Resources. (Defs' 56.1 ¶¶ 61, 90, 97; Pl's 56.1 ¶¶ 61, 90, 97.)

### 2. The 2016 Memorandum

The events relevant to the instant Motion begin in 2016.  On March 3, 2016, the then-Supervisor of Special Education filed a grievance against Gaon claiming that Gaon engaged in discriminatory hiring practices and treated black staff members unfairly.  (Pl's 56.1 ¶ 126; Defs' Resp. 56.1 ¶ 126; Sealed Decl. of Bryan D. Glass, Esq., in Opp., Ex. 5 (Dkt. No. 117-1).)

Some days later, Gaon attended a professional development workshop for school social workers and psychologists.  There, she made a comment that social workers—including Plaintiff—had to "prove their worth," while psychologists were more valued in the District. (Pl's 56.1 ¶ 127; Defs' Resp. 56.1 ¶ 127; Decl. of Deanna L. Collins, Esq., in Supp. ("Collins

---

under no obligation to consider them.  *See PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19-CV-7577, 2023 WL 2973038, at *2 (S.D.N.Y. Mar. 28, 2023) ("[T]he Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."); *see also Arrowhead Cap. Fin., Ltd. v. Seven Arts Ent., Inc.*, No. 14-CV-6512, 2016 WL 4991623, at *23 (S.D.N.Y. Sept. 16, 2016) (declining to consider "cursory" evidentiary objections in Rule 56.1 statement), *opinion withdrawn in part on reconsideration*, 2017 WL 1653568 (S.D.N.Y. May 2, 2017), *and aff'd*, 739 F. App'x 701 (2d Cir. 2018) (summary order).

Decl."), Ex. C ("Pl's Dep.") at 42:7–10 (Dkt. No. 112-3).)[2] [3]  According to Plaintiff, the District's social workers were predominately black, while psychologists were predominately white.  (*See* Pl's Dep. at 42: 6–10.)[4]

After consulting her colleagues, Plaintiff drafted a memorandum on behalf of District social workers to Gaon and Hamilton regarding Gaon's comments.  (*See* Collins Decl., Ex. P ("2016 Memorandum") (Dkt. No. 112-16).)  The Memorandum stated, among other things, that social workers "felt [that Gaon] publicly diminished [their] professional responsibilities while favoring school counselors."  (*See id*.)  The Memorandum also referenced other "snide" remarks that created "an intimidating, hostile[,] and offensive working relationship."  (*Id*.)  Notably, the Memorandum did not expressly mention "discrimination."  (*Id*.)

The Memorandum was initially anonymous, but Plaintiff testified that Gaon later caught wind that she (Plaintiff) authored it.  Specifically, Plaintiff recounts a conversation where DePaul told Plaintiff that Gaon was "pissed at [Plaintiff] for the March 2016 letter that [Plaintiff] wrote."

---

[2] Gaon denies making this statement.  (*See* Collins Decl., Ex. 5 ("Gaon Dep") at 70:8–25.)

[3] In the future, the Court respectfully suggests that Defendants use numbered exhibits in cases with such a large record.  It would save all Parties and the Court considerable time if, instead of searching for exhibit "JJ" or "HHH" in a list of 72 exhibits, they could just click on the respectively numbered exhibit.

[4] Defendants object to the use of "predominately" as argumentative, but the Court is under no obligation to consider that "semantic disagreement[]."  *See Hess v. Mid Hudson Valley Staffco LLC*, No. 16-CV-1166, 2018 WL 4168976, at *1 n.1 (S.D.N.Y. Aug. 30, 2018).  Aside from noting that the District employed both black and white social workers, (*see* Defs' Resp. 56.1 ¶ 128), Defendants offer no evidence to controvert Plaintiff's testimony regarding the group's racial makeup.

(Pl's Dep. at 45:15–19.)[5]  As discussed in detail, infra Section II.B.3, Plaintiff claims this

purported animus factored into certain decisions Gaon made during the 2018-2019 school year.

### 3.  The 2018-2019 School Year

The next set of events relate to Plaintiff's work assignments, specifically where she

worked and how high her caseload was.  Since 2007, Plaintiff was primarily assigned to

Longfellow Elementary School (now known as Rebecca Turner Elementary School ("RTES")),

although she occasionally split time with other buildings.  (Defs' 56.1 ¶ 9; Pl's 56.1 ¶ 9 (listing

split assignments in 2011 and 2012, among others).)[6]

As a general matter, the District would assign social workers to school buildings based on

the social worker's preference, in addition to factors like the District's overall needs, staffing

levels at the time, the number of students at a particular building, and the types of services

students required.  (Defs' 56.1 ¶ 10; Pl's 56.1 ¶ 10.)  DePaul testified that she and Gaon would

coordinate with supervisors and school principals to "establish assignments."  (DePaul Dep. at

70:22–71:10.)

For the 2018-2019 school year, Plaintiff received a split assignment with two days at

RTES and three days at "Lincoln," another school in the District.  (Defs' 56.1 ¶¶ 19, 21; Pl's

56.1 ¶¶ 19, 21.)  Upon receiving the assignment, Plaintiff complained that the split was

imbalanced as she was assigned significantly more students at RTES—indeed, twice the number

---

[5] DePaul does not recall this statement.  (*See* Collins Decl., Ex. O ("DePaul Dep.") at 50:14–22 (Dkt. No. 112-15).)  The Court addresses Defendants' objection that the statement is inadmissible hearsay infra Section II.B.3.

[6] The Parties dispute how to characterize this work history.  Defendants frame Plaintiff as having worked "in various school buildings" throughout her employment, while Plaintiff focuses on the fact that she was consistently assigned to one building and "occasionally" worked at others.  (Defs' 56.1 ¶ 9; Pl's 56.1 ¶ 9.)  Both are reasonable characterizations of the record, but the Court, as it must, adopts the version more favorable to Plaintiff, the non-movant.

she served the year prior—than at Lincoln. (*See* Defs' 56.1 ¶ 22; Pl's 56.1 ¶ 22; Collins Decl., Ex. V (email exchange indicating Plaintiff had a total of 14 "mandated student counseling" cases at Lincoln and 26 at RTES) (Dkt. No. 112-22).)

Plaintiff subsequently adjusted her schedule to allow for more time at RTES. (Defs' 56.1 ¶ 23; Pl's 56.1 ¶ 23.) Nevertheless, Plaintiff asserts that she still had one of the highest caseloads in the District. (Pl's 56.1 ¶ 20.)[7] Plaintiff testified that her caseload, comprised of 40 students who required counseling, (*see* Collins Decl., Ex. V, at 3 (Dkt. No. 112-22), in addition to numerous parents, became "unmanageable to the point where [Plaintiff] was not able to do [her] job," (Pl's Dep. at 118:11–12).

Plaintiff also testified to a workload disparity among social workers in the District. Specifically, she stated that there were three white social workers—Nicole Howie, Alexis Santavicca, and Randall Smith—who all had "low caseloads" or at least "*lower* caseloads" than she did. (Pl's Dep. at 46:13–17 (emphasis added).) By contrast, she pointed to three black social workers—Alethia Bryant, Essence Ware, and Janeal Cabrera—who all had "similar schedule[s]" to hers, at least one of whom had a "very high caseload." (*Id*. at 46:18–25.)[8] It is undisputed

---

[7] The Court uses "asserts" here because Plaintiff has not adduced evidence regarding the exact numbers of students on her colleagues' caseloads. The assignment chart and related testimony cited in paragraph 20 of Plaintiff's 56.1 statement address assignments during the 2019-2020 school year, not 2018-2019. (*See* Decl. of Bryan D. Glass, Esq., ("Glass Decl."), Ex. 4 (2019-2020 assignment chart) (Dkt. No. 115-4); Pl's Dep. at 242 (testifying to information recorded in said chart).) The Court notes Defendants' evidentiary objections to the chart, (Defs' Reply 1–2), but need not address them as it does not rely on the chart in this Opinion & Order.

[8] Defendants respond to a paragraph in Plaintiff's Rule 56.1 Counterstatement where this testimony is cited with "Objection. Lack of personal knowledge; hearsay." (*See* Defs' Resp. 56.1 ¶ 144.) However, they neither identify the portion of the testimony to which they object nor provide a basis for the objection such as testimony about how Plaintiff came to know this information. (*See id*.) In fact, Defendants rely on the same portion of Plaintiff's testimony in their Rule 56.1 statement to establish Plaintiff's colleague's race and where they worked during the 2018-2019 school year. (Defs' 56.1 ¶ 25 (citing Pl's Dep. at 46:10–15).) If Plaintiff had

that Smith and Bryan had split assignments during the 2018-2019 school year. (Defs' 56.1 ¶ 25; Pl's 56.1 ¶ 25.)[9]  And Santavicca nominally had a split assignment, albeit to two schools located on the same campus. (Defs' 56.1 ¶ 25; Pl's 56.1 ¶ 25.)  It is also undisputed that Plaintiff received the "highest marks possible" in her 2018-2019 school year evaluation. (Defs' 56.1 ¶ 24; Pl's 56.1 ¶ 24.)

### 4.  The 2019-2020 School Year

Although the Parties devote considerable attention to the 2019-2020 school year in their Rule 56.1 statements, only a few events that year relate to the instant Motion.

As relevant here, Plaintiff received a memorandum on May 12, 2020, (the "May 12 Memorandum"), from Defendant Burnett. (Defs' 56.1 ¶ 52; Pl's 56.1 ¶ 52; Collins Decl., Ex. CC ("May 12 Memorandum") (Dkt. No. 112-29).)  The Memorandum stated that Plaintiff failed to comply with several "directives" related to logging and recording her outreach to families and her sessions with students. (Defs' 56.1 ¶ 53; Pl's 56.1 ¶ 53.)[10]  Plaintiff vehemently

---

personal knowledge of those matters, it is not unreasonable to assume that she also knew—based on observation or her experience "in various school buildings," (*see id*. ¶ 9)—how high the caseload was at each school.

[9] Plaintiff somewhat misleadingly asserts in paragraph 25 of her Rule 56.1 statement that Gaon changed her white colleague's split assignment "to a full time position." (*Id*. (citing Pl's Dep. at 47:3–23).)  While true in a broad sense, Plaintiff testified Gaon did so *in the 2019-2020* school year, not the 2018-2019 school year. (Pl's Dep. at 8–10 ("The following year, [Gaon] changed the package . . . and put Alexis at Pennington full time.").)  The difference is highly relevant as the Court dismissed any claims of discrimination premised on assignment disparities during 2019-2020 school year in its prior opinion. *See Kirkland-Hudson I*, 665 F. Supp. 3d at 452 ("[T]he Court concludes that Plaintiff has not plausibly alleged any adverse employment actions during the 2019–2020 school year.").

[10] The record also contains a September 16, 2020, "Letter of Counsel" from Gaon outlining certain "guidelines" for attending recorded videoteleconference meetings. (*See* Glass Decl., Ex. 20 (Dkt. No. 115-20).)  In contrast to the May 12 Memorandum, the Letter of Counsel does not appear to make any findings regarding whether Plaintiff failed to carry out any of her job duties. (*See id*.)

disputes the Memorandum's finding as "unwarranted" or "unfair" descriptions of her work. (*See* Pl's 56.1 ¶¶ 34–53.) There is also a dispute about whether Plaintiff—the only social worker to receive such a communication—was unique in her recording and logging practices. (Defs' 56.1 ¶ 54; Pl's 56.1 ¶ 54.)

It is undisputed, however, that Plaintiff was not disciplined in connection with the May 12 Memorandum and that she received the highest possible marks in her 2019-2020 school year evaluation. (Defs' 56.1 ¶¶ 56–57, 59; Pl's 56.1 ¶¶ 56–57, 59.)

### 5.  The 2020-2021 School Year & Plaintiff's FMLA Leave

On February 9, 2021, Plaintiff requested 12 weeks of FMLA leave to begin on March 1, 2021, because she had to focus on mental/medical self-care. (Defs' 56.1 ¶ 60; Pl's 56.1 ¶ 60; *see* Collins Decl., Ex. JJ ("Pl's FLSA App.") (Dkt. No. 112-36).) Supporting documentation from Plaintiff's physician indicated that Plaintiff had been "diagnosed with post-traumatic stress disorder, major depressive disorder, and generalized anxiety disorder"—conditions "exacerbated by triggering social environment[s]." (Pl's FLSA App. at 7.) The physician added that Plaintiff was "actively triggered in [her] work environment," causing her to "experience[] panic attacks, shortness of breath, heart racing, and confusion." (*Id*. at 8.)

The District initially denied Plaintiff's request on March 25, 2021, after a District medical examiner determined that Plaintiff did not have a serious health condition. (Defs' 56.1 ¶ 65; Pl's 56.1 ¶ 65.) Plaintiff objected to that decision on April 1, 2021, and notified the District via email that she would use sick days to take off work through April 30, 2021. (Defs' 56.1 ¶ 67; Pl's 56.1 ¶ 67.) Plaintiff's April 1, 2021, email stated that she would not have access to email while away from work and asked that any future correspondence regarding her leave be mailed to her home address. (*See* Collins Decl., Ex. PP ("April 1 Email") (Dkt. No. 112-42.)

Then, on April 14, 2021, the District sent Plaintiff a letter stating that, given Plaintiff's

"continued insistence that [she was] entitled to [] FMLA leave," she would be allowed "to access

FMLA during [her] period of absence" and that Plaintiff was "entitled to twelve (12) weeks of

leave in accordance with FMLA." (Collins Decl., Ex. QQ ("April 14 Letter") (Dkt. No. 112-

43).)[11]  The letter stated Plaintiff's leave would begin on March 8, 2021, and expire on April 30,

2021. (*See id.*)  It also directed Plaintiff to provide additional medical documentation if she

sought to extend her leave beyond April 30, 2021. (*See id.*)  The Parties appear to agree—

notwithstanding some semantic disputes—that the letter in essence approved Plaintiff for a

period of FMLA leave retroactive to March 8, 2021. (Defs' 56.1 ¶¶ 69–71; Pl's 56.1 ¶¶ 69–71.)

The District emailed the April 14 Letter to Plaintiff and had a messenger, whom it

employed, attempt to hand-deliver a copy to Plaintiff's home. (Defs' 56.1 ¶ 73; Pl's 56.1 ¶ 73.)

Plaintiff contends that this form of delivery was in tension with her April 1 email requesting

correspondence via mail. (*See* Pl's 56.1 ¶ 73.)  It is undisputed, though, that the District employs

messengers to hand deliver certain time-sensitive correspondence to employees at their homes as

a matter of routine practice. (Defs' 56.1 ¶ 75; Pl's 56.1 ¶ 75; *see also* Aff. of Jessica Graves

("Graves Aff.") ¶¶ 3–4 (Dkt. No. 111) (attesting to this practice).)

Plaintiff emailed the human resources ("HR") department on May 4, 2021, stating that

she would "continue to use [her] sick days" along with a "certificate of illness" from her

physician. (*See* Collins Decl., Ex. UU (Dkt. No. 112-47.)  In response, the District emailed and

hand-delivered a letter, dated May 5, 2021, directing Plaintiff to provide updated medical

---

[11] Plaintiff disputes whether the April 1, 2021, email constituted a distinct request for
FMLA leave. (*See* Pl's 56.1 ¶ 69.)  Defendants claim that they construed the April 1, 2021,
email as such a request "and approved it." (*See* Defs' 56.1 ¶ 69.)  In either event, what matters is
that Plaintiff was ultimately granted FMLA leave. (*See infra* Section II.B.5.)

documentation by no later than May 10, 2021, as it found the certificate of illness illegible. (Defs' 56.1 ¶¶ 79–80; Pl's 56.1 ¶¶ 79–80.)  Defendants' messenger made two attempts at hand delivering the letter—on May 6 and May 7, 2021—but Plaintiff did not come to the door.  (*See* Collins Decl., Ex. TT at 4 (Dkt No. 112-46).)

On May 7, 2021, Plaintiff emailed back stating that she would provide updated documentation and clarifying that she sought to take sick leave as provided for by her collective bargaining agreement, not FMLA leave.  (*See* Collins Decl., Ex. VV at 5–6 (Dkt. No. 112-48)); *id.* at 3 (updated note from Plaintiff's physician); *see also id.* at 2 (Plaintiff's email stating she wanted to "ensure [her] absences are being marked as sick days, not FMLA").)  Plaintiff reiterated her request to have further correspondence mailed to her.  (*Id.* at 6.)  She specifically requested that Defendants "not send anyone to [her] home address for any reason" as she viewed this as "intimidation and harassment."  (*Id.*)

Nevertheless, a District messenger visited Plaintiff's home on May 13, 2021, with a follow-up letter from the District.  (*See* Collins Decl., Ex. SS (doorbell footage from Plaintiff's Ring camera stamped May 7 and May 13, 2021) (Dkt. No. 112-45).)  In that letter, the District once again construed Plaintiff's request for sick leave as a request for FMLA leave and approved Plaintiff for said leave based on the updated information it received from Plaintiff's physician. (Defs' 56.1 ¶ 85; Pl's 56.1 ¶ 85; Collins Decl., Ex. XX (Dkt. No. 112-50).)

Plaintiff filed a Police report on May 14, 2021, regarding the messenger's visits to her home, which she perceived as harassment. (*See* Glass Decl., Ex. 38 (Dkt. No. 115-38).)  And Plaintiff testified that she felt harassed because the messenger repeatedly rang her doorbell and "pac[ed] up and down [Plaintiff's] street on the four visits to her home.  (*See* Pl's Dep. at 211:18–212:1.)

Plaintiff was ultimately cleared to return to work on June 1, 2021.  (Defs' 56.1 ¶ 86; Pl's 56.1 ¶ 86.)

### 6.  The 2021-2022 School Year

The final set of events relate to internal grievances Plaintiff filed during the 2021-2022 school year.

Namely, on December 20, 2021, Plaintiff filed parallel internal complaints against Defendants DePaul and Hamilton.  (*See* Collins Decl., Ex. III ("DePaul Compl.") (Dkt. No. 112-61); *id.*, Ex. JJJ ("Hamilton Compl.") (Dkt. No. 112-62).)  Those complaints stated, in essence, that the two Defendants made public mention of the fact that Plaintiff declined interest in an internal job posting to discredit her and damage her career prospects.  (*See* Pl's 56.1 ¶ 224; Defs' Resp. 56.1 ¶ 224.)  While the body of the complaints did not mention Plaintiff's race or expressly complain of "discrimination," each one stated that this incident was a form of "continued harassment, intimidation and retaliation" in reference to Plaintiff's EEOC charge and her Complaint in the instant Action. (Defs' 56.1 ¶ 99; Pl's 56.1 ¶ 99.)[12]

On January 18, 2022, Plaintiff submitted a request for reasonable accommodations related to her "hypertension, high cholesterol, obesity, sleep apnea, and mental health" and associated "increase[d] risk for severe illness from COVID[-]19."  (Defs' 56.1 ¶ 102; Pl's 56.1 ¶ 102; Collins Decl., Ex. LLL ("Pl's Accommodation Req.") (Dkt. No. 112-64).)  The request form contained two sections—one for Plaintiff's requests, and one seeking input from her healthcare provider.  (Pl's Accommodation Req.)  Plaintiff's request contained four "options":

(1) reassignment to work in-person only from RTES (from her split assignment between RTES and Lincoln);
(2) continuing her split assignment but making changes to her office space at Lincoln to allow for social distancing and better ventilation;

---

[12] These events—which post-date the filing of this Action—were raised by way of Plaintiff's Second Amended Complaint.  (*See* SAC ¶ 58.)

(3) providing Plaintiff with "appropriate PPE supplies" including N95 masks; and (4) allowing Plaintiff to work entirely from home.

(*Id*. at 2.)  Plaintiff's healthcare provider, however, indicated that working "in a single location" was "required" and recommended that Plaintiff work remotely if possible.  (*Id*.)

Defendants responded on January 26, 2022, nominally granting Plaintiff's options (2) and (3) by providing her PPE supplies and an air purifier for her office space at Lincoln.  (Collins Decl., Ex. MMM at 2 (Dkt. No. 112-65).)  Plaintiff disputed (and continues to dispute) whether this was a sufficient response to her request.  (*See* Pl's 56.1 ¶ 105; Collins Decl., Ex. NNN (Dkt. No. 112-66).)  In any event, she submitted a follow-up request to work from a single location consistent with her physician's recommendation.  (*See id*.)  Defendant Tiggs responded via email denying that request.  (Defs' 56.1 ¶¶ 107–10; Pl's 56.1 ¶¶ 107–10.)  Tiggs explained that the District was not "offering the option to work remotely" and she reminded Plaintiff that Plaintiff only worked at one location on any given day.  (Defs' 56.1 ¶ 108; Pl's 56.1 ¶ 108.)

B.  Procedural History

The Parties submitted a joint proposed briefing schedule on November 14, 2023, which the Court adopted in lieu of a pre-motion conference.  (*See* Order (Dkt. No. 106).)  After an extension, (Dkt. No. 108), Defendants moved for summary judgment on January 16, 2024.  (Not of Mot; Collins Decl.; Graves Aff.; Mem. of Law in Supp. ("Defs' Mem.") (Dkt. No. 113).)  Plaintiff filed her Opposition on March 11, 2024.  (Pl's Mem.; Glass Decl; Sealed Glass Decl. (Dkt. No. 117-1).)  And, after an extension, (Dkt. No. 119), Defendants replied on April 8, 2024.  (Reply Mem. of Law ("Defs' Reply") (Dkt. No. 124); Defs' Resp. 56.1; Reply Aff. of Deanna L. Collins, Esq. (Dkt. No. 123.).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same) (quoting Fed. R. Civ. P. 56(a)).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that h[er] allegations were correct; [s]he need[s] to 'come

forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (internal quotation marks and citation omitted); *see also Streichert v. Town of Chester*, No. 19-CV-7133, 2022 WL 4449305, at *4 (S.D.N.Y. Sept. 23, 2022) ("It is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (alteration omitted) (quoting *Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 608 (2d Cir. 2006))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At this stage, 'the role of the court is not to

resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"

*U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept.

28, 2023) (alteration adopted) (quoting *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011)).

Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'"

*Id.* (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should "consider only

evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL

6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am.,*

*Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)). "Where a party relies on affidavits . . . to establish facts,

the statements 'must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *Mozzochi*

*v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023)

(quoting Fed. R. Civ. P.56(c)(4)); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012)

(same); *E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL

6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to

be supported with affidavits based on personal knowledge . . . ." (internal citation omitted));

*Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal

knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24,

2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness

had personal knowledge." (internal quotation marks and citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of

witnesses at the summary judgment stage." *Martinez v. Pao's Cleaning, Inc.*, No. 16-CV-6939,

15

2018 WL 6303829, at *2 (E.D.N.Y. Dec. 3, 2018) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)).  However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment," *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations omitted) (internal quotation marks and citation omitted)).  As such, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof."  *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

### B.  Analysis

Defendants seek summary judgment on a host of issues.  The Court begins (1) by considering whether the District is a proper Defendant as to any of Plaintiff's state law claims.  It

then addresses (2) Plaintiff's race discrimination claim, (3) her hostile environment claims, (4) her claims of retaliation based on filing complaints of discrimination, and (5) her claim that Defendants retaliated against Plaintiff for exercising her rights under the FMLA.

### 1. Claims Against the District

As an initial matter, Defendants argue that Plaintiff's state law claims against the District should be dismissed for failure to submit a timely notice of claim. (Defs' Mem. 25.)

NYSHRL claims that "are brought against a school district, board of education, or school officer are subject to the notice of claim requirements contained in New York Education Law § 3813(1)." *Nelson v. Mount Vernon City Sch. Dist.*, No. 15-CV-8276, 2017 WL 1102668, at *3 (S.D.N.Y. Mar. 23, 2017) (alteration adopted) (citation omitted). That provision states, in relevant part, that no "action or special proceeding" shall be "maintained against any school district, board of education," or officer of the same unless "a written verified claim upon which such action . . . is founded was presented *to the governing body of said district or school* within three months" of when the claim accrued. N.Y. Educ. Law § 3813(1); *see also Johnson v. Rockland Cnty. BOCES*, No. 21-CV-3375, 2022 WL 4538452, at *5 (S.D.N.Y. Sept. 28, 2022) (same).[13] The failure to "present a claim within the statutory time limitation or to notify the correct party is a fatal defect" in any such action. *Id*. (emphasis omitted) (quoting *Parochial Bus Sys., Inc. v. Bd. of Educ. of City of N.Y.*, 458 N.E.2d 1241, 1245 (N.Y. 1983)); *see also*

---

[13] Defendants appear to concede that the Individual Defendants are not "officers" within the meaning of this provision. (*See* Pl's Mem. 22; *see generally* Defs' Reply.) *See Collins v. City of New York*, 156 F. Supp. 3d 448, 460 (S.D.N.Y. 2016) (holding that "[s]uperintendents qualify as officers upon whom a notice of claim must be filed, but principals [and lesser officials] do not" (citing N.Y. Educ. Law § 2(13) (defining a "school officer" as an "elective or appointive officer in a school district whose duties generally relate to the administration of affairs connected with the public school system"))).

*Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 366 (W.D.N.Y. 2010) (explaining that compliance with Section 3813(1) is a "statutory condition precedent" to suit).

Plaintiff concedes that she did not submit a formal notice of claim, as required by other statutory notice provisions, *see, e.g.*, N.Y. Educ. Law § 3813(2) (stating requirements for noticing state law tort claims), but argues that such formal notice is not required. Instead, she cites a group of cases holding that "that the requirement is met by any document sufficiently formal and detailed for the District to investigate the [alleged] claims." *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, No. 14-CV-6416, 2017 WL 2374363, at *8 (S.D.N.Y. May 31, 2017), *aff'd*, 750 F. App'x 41 (2d Cir. 2018) (summary order); *see also Walsh v. Scarsdale Union Free Sch. Dist.*, 375 F. Supp. 3d 467, 481 (S.D.N.Y. 2019) (collecting cases). As relevant here, those cases conclude that a "timely filed EEOC charge[]" coupled with "letters *to the district* outlining and explaining [] allegations of discrimination" is an "alternative[]" sufficient to comply with Section 3813(1). *See Walsh*, 375 F. Supp. 3d at 481 (emphasis added); *accord Berrie*, 2017 WL 2374363, at *8–9; *Melton v. Poughkeepsie City Sch. Dist.*, No. 16-CV-9701, 2017 WL 6502242, at *8 (S.D.N.Y. Dec. 18, 2017) (explaining that the plain language of Section 3813(1), in contrast to other notice-of-claim provisions, does not set out formal content requirements). Plaintiff contends that she satisfied this path to notice by filing an EEOC charge, which was later transmitted to Defendant Tiggs, the District's director of human resources. (*See* Pl's Mem. 23; Glass Decl., Ex. 31 ("EEOC Notice") (Dkt No. 115-31).)

Even if Plaintiff's reading of the statute is correct, she did not provide sufficient notice in this case. Courts finding EEOC complaints sufficient for purposes of Section 3813 do so "only under the rare and limited circumstance where the EEOC charge puts the school district on notice of the precise claim alleged, [and] is served on the governing board of the district."

*Sullivan v. N. Babylon Union Free Sch. Dist.*, No. 15-CV-834, 2016 WL 11673810, at *4

(E.D.N.Y. Mar. 21, 2016) (quoting *Brtalik v. S. Huntington Union Free Sch. Dist.*, No. 10-CV-

0010, 2010 WL 3958430, at *4 (E.D.N.Y. Oct. 6, 2010)). In other words, service on "a different

arm of the district," like "the District's Director of Human Resources," is not sufficient. *See id.*[14]

Accordingly, Plaintiff has failed to satisfy Section 3813(1)'s requirements and her state law

claims against the District are dismissed. *See Bacchus v. New York City Dep't of Educ.*, 137 F.

Supp. 3d 214, 234 (E.D.N.Y. 2015) (dismissing claim where plaintiff served EEOC complaint on

"DOE's legal department, not its governing board"); *Genco v. Starpoint Cent. Sch. Dist.*, No. 13-

CV-0301, 2015 WL 540217, at *3 (W.D.N.Y. Feb. 10, 2015) ("[B]ecause there is no evidence

that the EEOC charge was served on the governing body of [the] district, which is the Board of

Education, Plaintiff's NYSHRL claims must be dismissed . . . ." (quotation marks omitted)).[15]

### 2. NYSHRL Discrimination

Moving on to the merits, the Court begins with Plaintiff's NYSHRL race discrimination

claim.[16] In broad strokes, her claim is that Defendants, primarily Gaon, gave Plaintiff an

---

[14] Plaintiff states in her Rule 56.1 statement that a position statement was filed on behalf of the District and argues, by implication, that the "the District" must have been put on notice. (*See* Pl's 56.1 ¶ 191 (citing EEOC Notice; Gaon Dep. at 174:20–75:11); Pl's Mem. 22–23.) Yet, the document cited in relevant paragraph does not contain such a statement and Gaon, in the cited testimony, states that she had never seen the EEOC charge. (*See* Gaon Dep. at 174:5–175:11.) The Court therefore does not view either source as evidence that Plaintiff served the EEOC complaint on the required entity.

[15] Because Plaintiff has not satisfied a statutory condition precedent to suit against the District, the Court need not consider Defendants' substantive arguments about Plaintiff's ability to prove municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). (*See* Defs' Mem. 24–25.)

[16] The Court dismissed Plaintiff's parallel Title VII discrimination claim for failure to exhaust. *See Kirkland-Hudson v. Mt. Vernon Sch. Dist. ("Kirkland-Hudson I")*, 665 F. Supp. 3d 412, 456 (S.D.N.Y. 2023).

excessive workload during the 2018-2019 schoolyear because of Plaintiff's race.  (*See* Pl's Mem. 4–8.)

The burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs discrimination claims under the NYSHRL. *See Osinoff v. Nuvance Health*, No. 22-CV-2017, 2024 WL 967190, at *8 (S.D.N.Y. Mar. 5, 2024); *accord McCall v. Genpak*, LLC, No. 13-CV-1947, 2015 WL 5730352, at *11 (S.D.N.Y. Sept. 30, 2015).  "Under the test, a plaintiff must first establish a prima facie case" of discrimination. *Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d 72, 83 (2d Cir. 2015) (italics omitted).  Once the plaintiff has done so, "[t]he burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id*. (quoting *McDonnell Douglas*, 411 U.S. at 802).  "If such a reason is proffered, the burden shifts back to the plaintiff" to prove that that the employer's reason was a pretext—in other words, "to prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

The Second Circuit has stated repeatedly that "an extra measure of caution is merited before granting . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quotation marks omitted); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (noting that the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case" especially where the merits "turn on a dispute as to the employer's intent" (quoting *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008))).  Because discriminatory intent is "elusive" in nature, *Vega* 801 F.3d at 86, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if

believed, would show discrimination," *Banks*, 81 F.4th at 259 (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). That said, a plaintiff's "'reliance upon conclusory statements or mere allegations' will not suffice to defeat summary judgment." *Moll*, 94 F.4th at 228 (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)). Summary judgment remains proper when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id*. (quoting *Celotex*, 477 U.S. at 322–23). As the same approach applies to claims under all three statutes at issue, the Court evaluates the substance of Plaintiff's claims concurrently.

To establish a prima facie case, a plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega*, 801 F.3d at 83 (quoting *Weinstock v. Columbia Univ*., 224 F.3d 33, 42 (2d Cir.2000)). Here, Defendants accept that Plaintiff is a member of a protected class as a black woman, that she was qualified, and that an overbearing workload can qualify as an adverse employment action. (*See* Defs' Mem. 17–19.) *See Kirkland-Hudson I*, 665 F. Supp. 3d at 451 (explaining that "'the assignment of an excessive workload' as a result of 'discriminatory intent, can be an adverse employment action'" (quoting *Vega*, 801 F.3d at 88)). This step of the *McDonnell Douglas* analysis thus turns solely on whether Plaintiff can show a minimal inference of discrimination.

"An inference of discriminatory motivation may be supported directly, such as by statements that an adverse employment action was related to [the] plaintiff's protected class, . . . or indirectly by a [showing] that [the] plaintiff was treated different from and less favorably than similarly situated peers." *Roache v. Long Island R.R*., 487 F. Supp. 3d. 154, 172 (E.D.N.Y. 2020) (first citing *Haskell v. Kaman Corp*., 743 F.2d 113, 119 (2d Cir. 1984) then *Marquez v.*

*Starrett City Assocs.*, 406 F. Supp. 3d 197, 208–09 (E.D.N.Y. 2017)).  To show disparate

treatment, in turn, a plaintiff must demonstrate "that she (1) was similarly situated to other

[comparable] employees, and (2) was treated less favorably than those employees."  *Ehrbar v.*

*Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015) (citing *Raspardo v. Carlone*, 770 F.3d

97, 126 (2d Cir. 2014)).  The similarly situated comparator need not be "identical" to the

plaintiff, just "similarly situated in all material respects."  *Raspardo*, 770 F.3d at 126 (quoting

*Graham*, 230 F.3d at 39).  At the prima facie step of the analysis, "[the] plaintiff also may create

a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together

give rise to an inference of discrimination."  *Stinnett v. Delta Air Lines, Inc*., 278 F. Supp. 3d

599, 611–12 (E.D.N.Y. 2017) (quoting *Vega*, 801 F.3d at 87).

　　　　As she did at the pleading stage, Plaintiff asserts a prima facie case of discrimination

based on disparate treatment.  She adduces evidence that her caseload included 40 students split

between two schools, heavily weighted towards the school where she spent fewer days each

week.  (Pl's 56.1 ¶¶ 137–140; *see also* Collins Decl., Ex. U at 2 (raising this concern

contemporaneously with Defendants) (Dkt. No. 112-21); *id*., Ex. V (email containing Plaintiff's

schedule) (Dkt. No. 112-22).)  By contrast, she points to three white social workers who were

assigned lower caseloads, at least two of whom were assigned to a single building.  (*See* Pl's

56.1 ¶ 144; DePaul Dep. at 34:2–36:25 (testifying to the race of the relevant social workers and

that Randall Smith and Michelle O'Neill were, at least at some point, assigned to a single

building).)  And Plaintiff testified that the disparity applied not only to her but to other black

social workers as well, as they, too, were assigned higher caseloads.  (*See* Pl's Dep. 46:10–47:2.)

Although not discussed by the Parties, the Court assumes Plaintiff and the three social workers

were similarly situated.  Indeed, they all appear to have held the same job in the same district and

to have reported to the same officials.  Accordingly, the "Court can draw from those facts the minimal inference that Plaintiff and [the three social workers] share[d] 'sufficient employment characteristics' for the purposes of this analysis."  *See Osinoff*, 2024 WL 967190, at \*12 (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001)).  Accordingly, the apparent disparity between these individuals is enough to raise an inference of discrimination.  *See Roache*, 487 F. Supp. at 172 ("An inference of discriminatory motivation may be supported . . . indirectly by a [showing] that [the] plaintiff was treated different from and less favorably than similarly situated peers.").

Defendants' main response is that Plaintiff admitted her caseload was lower than her colleagues during the 2018-2019 school year.  (*See* Defs' Mem. 17 (citing Defs' 56.1 ¶ 20).)  But this point relies on a disputed reading of Plaintiff's testimony at a state Public Employment Relations Board ("PERB") hearing.  Plaintiff was asked why she was "split between two schools" and responded that "[a]t one point the formula that the [District] . . . was using was based on the caseload" and added "[a]t the time I had a lower caseload compared to my other colleagues."  (Collins Decl., Ex. N ("PERB Tr.") at 17:20–18:5 (Dkt. No. 112-14).)  Although the transcript does not raise specific dates, Defendants' view is that "[a]t the time" referred to the 2018-2019 school year.  (Defs' Mem. 17.)  Yet they point to nothing in the PERB hearing to support that reading.  A better reading is that Plaintiff had a lower caseload *prior* to 2018-2019, warranting the split assignment based on the District's assignment formula.  And that alternate view is consistent with other record evidence.  Indeed, Plaintiff had a split assignment as early as the 2017-2018 school year, (Defs' 56.1 ¶ 9), and she testified that her workload at *that* time was "manageable' (Pl's Dep. at 119:5–10).  At the very least, the Court does not view Plaintiff's

statement as an admission that defeats her prima facie case.  Any inconsistency in testimony is something Defendants can raise at trial.

Defendants do little more to contest Plaintiff's evidence of disparate treatment.  Although they point out that Plaintiff agreed to a split assignment and that certain white social workers had split assignments, (Defs' Mem. 17), Defendants do not address their relative workloads.  Plaintiff's claim here is not just that she had to work between two schools; she did that before without issue.  (*See* Pl's 56.1 ¶ 121.)  Instead, Plaintiff's claim is that that her workload was excessive and unmanageable in the context of that split.  (*See* Pl's Mem. 5–6.)  And her theory of disparate treatment is that her black colleagues had similarly excessive caseloads, in contrast to white social workers, who did not.  (*See id*.)

What Defendants may really be getting at is that Plaintiff's evidence of disparate treatment is thin.  And, in fairness to Defendants, it seems to boil down to a few lines of Plaintiff's testimony.  (*See* Pl's Dep. at 46.)  Yet that testimony, alone, is "independently sufficient" to give rise to a dispute of material fact.  *See Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019); *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016) (stating that "[a]t summary judgment, [the plaintiff] was entitled to rely on his own testimony to establish his . . . claim."); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth*., 743 F.3d 11, 20 (2d Cir.2014) ("[D]istrict courts should not engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." (quotation marks omitted)).  Defendants offer no indication that Plaintiff's testimony is "so replete with inconsistencies and improbabilities" that no juror would credit her statements.  *See Bellamy*, 914 F.3d at 746.  And, notably, Defendants

present no evidence of their own to establish that the social workers' respective caseloads were anything other than what Plaintiff says they were.[17]

Plaintiff has therefore satisfied her "de minimis" prima facie showing. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (stating prima facie showing need only be "minimal" (quoting *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).[18]

As Plaintiff has presented a prima facie case, the burden shifts to Defendant to establish a legitimate, non-discriminatory reason for terminating Plaintiff. The employer's burden is one of "production" not persuasion, *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993)), and thus "is not a particularly steep hurdle," *Hyek v. Field Support Servs., Inc*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012) (summary order). "Both the Supreme Court and [the Second Circuit] have emphasized that, in typical discrimination and retaliation cases, the defendant must articulate its legitimate, nondiscriminatory reason with some specificity." *Bucalo*, 691 F.3d at 132. Defendants must thus "clearly set forth, through the introduction of admissible evidence, the reasons for the [alleged adverse action]." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981).

---

[17] On this point, the Court finds the lack of documentary evidence regarding social workers' respective caseloads during the 2018-2019 school year exceedingly strange. Nevertheless, it does not—and cannot—draw inferences about that lack of evidence.

[18] Defendants also make arguments to the extent Plaintiff based her claim on a disparity *between* social workers and psychologists, as opposed to a disparity *among* social workers. (Defs' Mem. 17–18.) While there are some questions about whether the two groups are similarly situated, the Court need not address these arguments as Plaintiff clearly raises a fact dispute as to disparate treatment among social workers.

Defendants have failed to carry that burden here.  Instead of providing a "specific" justification for Plaintiff's workload, Defendants state generally that assignments depend "on many factors" and assert, without citation, that a social worker's caseload could increase based on the number of registered students at a given school.  (Defs' Mem. 19.)  However, taken as true, none of this articulates with *any* specificity a reason for making Plaintiff's caseload higher than her peers.  *See Bucalo*, 691 F.3d at 132.  Defendants do not discuss which factors produced Plaintiff's caseload, or present evidence that Gaon applied those factors to Plaintiff.  In fact, when asked whether issues like staffing concerns contributed to Plaintiff's assignment, Gaon testified that she could not recall and similarly could not remember adjusting Plaintiff's split schedule.  (*See* Gaon Dep. at 78:3–16.)  And DePaul—the other individual responsible for assignment decisions—testified that she did not recall discussions regarding Plaintiff's assignment.  (*See* DePaul Dep. at 30:6–21.)  Defendants, in other words, have failed to "meet [] plaintiff's prima facie case."  *See Burdine*, 450 U.S. at 255.  And that failure is grounds for denying the motion as to this claim.  *Sollazzo v. Just Salad Rest.,* No. 15-CV-252, 2018 WL 1273661, at *7 (S.D.N.Y. Mar. 5, 2018) (denying summary judgment where "the evidence submitted by [the d]efendant [could not] permit the conclusion that it gave more favorable assignments to Hispanic delivery persons for a nondiscriminatory reason"); *Mandell v. County of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2003) (finding defendants did not provide legitimate justification where they did not adduce evidence "with respect to the circumstances of th[e adverse action]").

### 3.  Title VII, § 1981, & NYSHRL Hostile Environment

Next, the Court considers Plaintiff's hostile environment claims under Title VII, § 1981, and the NYSHRL.  She presents two theories of liability:  (a) that she faced a hostile environment due to her excessive workload during the 2018-2019 school year; and (b) that she

26

faced a distinct hostile environment during the 2020-2021 school year because of certain

disciplinary communications.  (*See* Pl's Mem. 15–19.)

Title VII, § 1981, and the NYSHRL each prohibit employers from subjecting employees

to a hostile work environment.  *See Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir.

2015) (explaining that "[t]he phrase terms, conditions, or privileges of employment [in Title VII]

evinces a congressional intent to strike at the entire spectrum of disparate treatment, which

includes requiring people to work in a discriminatorily hostile or abusive environment"

(alteration omitted) (quoting *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012)));

*accord Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 119 (S.D.N.Y. 2022); *see also*

*Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 69 (2d Cir. 2000) ("Section 1981

provides a cause of action for race-based employment discrimination based on a hostile work

environment."); *see also* N.Y. Exec. Law § 296(1)(a).  Claims under all three statutes are judged

under broadly the same standard.  *See Littlejohn*, 795 F.3d at 320–21 (applying same standard to

hostile work environment claims brought under Title VII and Section 1981); *Zheng-Smith*, 486

F. Supp. 3d at 623 ("As with discrimination, analyses of hostile work environment claims under

federal and New York law are coextensive."); *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp.

3d 309, 334 (S.D.N.Y 2020) ("Hostile work environment claims under Title VII and the

NYSHRL are judged by the same standard." (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–

24(2d Cir. 2013))).  The only difference among the various standards is that "[o]n October 11,

2019, amendments to the NYSHRL came into effect that eliminated the 'severe and pervasive

standard,'" such that plaintiffs now need to show only that they were "subjected to inferior

terms, conditions, or privileges of employment because of the individual's membership in one or

more protected categories." *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507, 2021 WL 4177209, at *13 (S.D.N.Y. Sept. 14, 2021); *see also Alvarado*, 631 F. Supp. 3d at 119 (same).

Defendants seek summary judgment on both of Plaintiff's hostile environment claims. And the Court addresses their arguments in turn.

Plaintiff's hostile environment claim regarding her caseload during the 2018-2019 school year rises and falls with her discrimination claim. Defendants accept, as the Court held before, that "a heavier workload alone can support a viable hostile work environment claim" if Plaintiff faced "disproportionately burdensome work assignments." *See Kirkland-Hudson I*, 665 F. Supp. 3d at 466 (quoting *Wilson v. Family Dollar Stores of N.Y., Inc*., No. 06-CV-639, 2008 WL 4426957, at *8 (E.D.N.Y. Sept. 25, 2008)); *see also Sanderson v. Leg Apparel LLC*, No. 19-CV-8423, 2020 WL 3100256, at *8 (S.D.N.Y. June 11, 2020) ("A reasonable employee could find that the assignment of a disproportionate workload altered her employment conditions for the worse." (quotation marks and citation omitted)). And they—surprisingly—make no argument about whether the environment Plaintiff faced fell short of the Title VII "severe and pervasive standard." (*See generally* Defs' Mem.) Instead, Defendants' arguments mirror their attacks on Plaintiff's evidence of discrimination, which the Court addressed above. Namely, they again argue Plaintiff faced a "lower" workload than her peers and that any burden is not traceable to discriminatory animus. (*See* Defs' Mem. 13–14 (stating Plaintiff's hostile environment claims fail "under any standard[] because there is no evidence of any race-based harassment).) Accordingly, because there are fact disputes as to both the extent of Plaintiff's caseload, and about whether she was assigned that caseload because of her race, *see supra* Section II.B.2, summary judgment is denied as to this claim as well.

The same is not true of Plaintiff's claim regarding the May and September 2020 Memoranda. Her argument is that the Memoranda constitute unfair discipline because they contain false statements about her performance. (*See* Pl's Mem. 17.)[19] She further contends that the Memoranda are "adverse" because they could have "be[en] used at a disciplinary proceeding," presumably as evidence of poor performance. (*See id*. at 18.) The problem for Plaintiff, however, is that she was never actually disciplined. (*See* Defs' 56.1 ¶ 56; Pl's 56.1 ¶ 56.) Courts in the Second Circuit have repeatedly held that similar memoranda that do not "place the employee in an 'active disciplinary process' do not constitute adverse employment actions 'as a matter of law.'" *Stallworth v. New York*, No. 16-CV-3059, 2017 WL 4355897, at *19 (S.D.N.Y. July 27, 2017) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 570 (2d Cir. 2011)), *report and recommendation adopted*, 2017 WL 4342148 (S.D.N.Y. Sept. 28, 2017); *see also Johnson*, 2022 WL 4538452, at *13 (explaining that "reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results" and collecting cases (quotation marks omitted)); *Tillery v. New York State Off. of Alcoholism & Substance Abuse Servs*., 739 F. App'x 23, 26 (2d Cir. 2018) (finding summary judgment for defendant was proper because a "poor performance evaluation" coupled with an "inspector general referral" did not constitute an adverse employment action absent any discipline) (summary order). And, standing alone, they similarly fail to give rise to a hostile work environment. *See Hussey v. New York State Dep't of L./Off. of Atty. Gen*., 933 F. Supp. 2d 399, 412 (E.D.N.Y. 2013). Indeed, courts have held that threats of discipline even coupled with targeted workplace interactions are not sufficient. *See id*.

---

[19] The Court mostly references May 12 Memorandum because it formed Plaintiff's core claim in her Complaint. But this rationale applies equally to other allegedly false statements that Defendants did not act on. (*See* Pl's Mem. 18.)

at 409–13 (holding plaintiff failed to allege a hostile environment based on allegedly defamatory memorandum placed in her file, a failure to promote the plaintiff, and removal of plaintiff from a case she was working on); *Risco v. McHugh*, 868 F. Supp. 2d 75, 116 (S.D.N.Y. 2012) (holding "two false counseling memoranda," attempts at isolation, and a termination recommendation, among other things, did not give rise to a hostile environment (quotation marks omitted)). Plaintiff's two relatively isolated threats of discipline similarly fail under either hostility standard. They are not sufficiently severe or pervasive for purposes of Title VII, and nothing about the Memoranda changed plaintiff's conditions of employment for purposes of the NYSHRL. *See Bernstein v. New York City Dep't of Educ.*, No. 19-CV-11816, 2021 WL 4429318, at *12 (S.D.N.Y. Sept. 27, 2021) (holding three disciplinary notices over two months did not create hostile environment and stating "an employer has the right to deliver a disciplinary notice to an employee . . . without subjecting itself to an employment discrimination lawsuit, for the risk of discipline . . . is an ordinary term and condition of employment"), *aff'd*, No. 21-2670, 2022 WL 1739609 (2d Cir. May 31, 2022). Accordingly, the Court grants summary judgment to Defendants to this claim.

#### 4. Title VII, § 1981, & NYSHRL Retaliation

Next up are Plaintiff's Title VII, § 1981, and NYSHRL retaliation claims. Here, too, there are multiple theories of liability. Plaintiff claims that (a) Gaon retaliated against Plaintiff for authoring an anonymous complaint about her in 2016 (the "2016 Memorandum"); and (b) Defendants denied a 2022 request for accommodations in retaliation for complaints filed against Hamilton and DePaul.

"Title VII forbids an employer from discriminating against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in any

investigation, proceeding, or hearing under this subchapter.'" *Farmer*, 473 F. Supp. 3d at

330 (alteration adopted) (quoting 42 U.S.C. § 2000e-3(a)). "The NYSHRL similarly makes it

unlawful for an employer to retaliate or discriminate against an employee because she 'has

opposed any practices forbidden under this article or because she has filed a complaint,

testified[,] or assisted in any proceeding under this article.'" *Id.* (alteration adopted) (quoting

N.Y. Exec. Law § 296(7)). Additionally, the Supreme Court has held that Section 1981

"prohibits not only racial discrimination but also retaliation against those who oppose it." *Univ.*

*of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355 (2013).

"The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation

claims under both Title VII and the NYSHRL." *Summa*, 708 F.3d at 125 (citing *Schiano*, 445

F.3d at 609); *see also Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII and

[Section] 1981 are both analyzed pursuant to Title VII principles and the *McDonnell*

*Douglas* burden-shifting evidentiary framework." (footnote omitted)); *Fincher v. Depository Tr.*

*& Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) ("Retaliation claims made under 42 U.S.C.

§ 1981, like those made under Title VII, are evaluated using a three-step burden-shifting

analysis."). "To make out a prima facie case of retaliation, a plaintiff must demonstrate that

'(1) she engaged in a protected activity; (2) the employer was aware of that activity; (3) the

employee suffered a materially adverse action; and (4) there was a causal connection between the

protected activity and that adverse action.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting*

*Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (italics omitted) (quoting *Lore v. City*

*of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)). "Once a prima facie case of retaliation is

established, the burden of production shifts to the employer to demonstrate that a legitimate,

non[-]discriminatory reason existed for its action." *Summa*, 708 F.3d at 125 (quoting *Raniola v.*

*Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)).  "If the employer demonstrates a legitimate, non-discriminatory reason, then 'the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.'"  *Id.* (alterations omitted) (quoting *Raniola*, 243 F.3d at 625).  "Significantly, a plaintiff alleging retaliation in violation of Title VII must show at the final step of the analysis that retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (quoting *Nassar*, 570 U.S. at 348, 360).

Two elements of a prima facie retaliation claim warrant additional attention here.  First, an adverse action is anything that "'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *see also Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) ("[R]etaliation is unlawful when the retaliatory acts were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (citation and quotation marks omitted)).  Thus, in contrast to the standards for discrimination and hostile environment claims, "an action need not affect the terms and conditions of a plaintiff's employment" to be adverse "for purposes of a retaliation claim."  *Fincher*, 604 F.3d at 720 n.6.

Second, with respect to the causation element, "a plaintiff must plausibly plead a connection between the act and [her] engagement in protected activity."  *Vega*, 801 F.3d at 90.  A plaintiff can demonstrate the causal connection in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in

32

similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ*., 232 F.3d 111, 117 (2d Cir. 2000); *see also Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 443 (S.D.N.Y. 2019) (same).

### a.  The 2016 Memorandum

The Court first takes up Plaintiff's retaliation claim regarding the anonymous 2016 Memorandum.  Plaintiff claims that the Memorandum constituted protected activity because it raised complaints about disparaging comments to predominately black social workers.  (Pl's Mem. 9–10.)  And her theory of retaliation is that Gaon discovered that Plaintiff was the author, leading Gaon to assign Plaintiff a higher caseload over two years later during the 2018-2019 school year.  (*See id.*)

Defendants renew their argument that Plaintiff's caseload was not "adverse" insofar as it was lower than that of her peers.  (*See* Defs' Mem. 24.)  But, as discussed above, this issue is at best disputed, and the Court must assume for these purposes the veracity of Plaintiff's testimony that her workload was, in fact, excessive.  Moreover, Defendants do not dispute that an excessive workload may constitute an adverse action even under the more exacting standard applicable to discrimination claims.  *See Vega*, 801 F.3d at 85 ("We have held that the assignment of 'a disproportionately heavy workload' can constitute an adverse employment action." (quoting *Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004)).  And it is worth mentioning with respect to all these claims that Defendants provide no authority that Plaintiff's caseload was *not* excessive under the circumstances.

There is also dispute about whether the 2016 Memorandum constitutes protected activity.  (*See* Defs' Mem. 23–24.)  Defendants' only argument here is a brief assertion that the Memorandum does mention race.  (*See id*.)  But "an employee is not required to mention discrimination or use particular language in order for a complaint to qualify as protected

33

activity." *See, e.g.*, *Trotter v. Nat'l Football League*, --- F. Supp. 3d ---, 2024 WL 2952637, at

*8 (S.D.N.Y. June 12, 2024) (quotation marks omitted). Instead, it is enough that Defendants

"could reasonably have understood" that the Memorandum "was directed at [prohibited]

conduct." *Kelly*, 716 F.3d at 15 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp*., 136

F.3d 276, 287 (2d Cir. 1998)). Here, the Memorandum complains of "snide" remarks that social

workers—who were predominately black, (*see* Pl's Mem. 9)—need to "prove their worth" as

compared to psychologists—who were predominately white, (*see id*.; 2016 Memorandum). And

while that may not move the needle much alone, Plaintiff adds that the Memorandum came on

the heels of other express complaints of discrimination, including a confidential grievance filed

against Gaon just two weeks prior. (*See* Sealed Glass Decl. at 1 (noting the grievances were

transmitted March 3, 2016); 2016 Memorandum (dated March 17, 2016).) Courts have held that

similar circumstances—allegations of what appears to be disparate treatment where an employer

was on notice of similar complaints—raise a dispute of fact regarding "protected" activity even

where a plaintiff does not specifically mention discrimination. *See Felty v. Regeneron Pharms.,

Inc.*, No. 18-CV-5667, 2021 WL 860379, at *16 (S.D.N.Y. Mar. 8, 2021) (finding protected

activity "in the context" of prior complaints warning of discriminatory behavior even though the

plaintiff did not expressly raise allegations of gender discrimination); *Van Brunt-Piehler v.

Absolute Software, Inc.*, 504 F. Supp. 3d 175, 194 (W.D.N.Y. 2020) (denying summary

judgment where the plaintiff's complaints "did not specifically use the term 'gender

discrimination,'" but "clearly communicate[d] that she was being treated differently than her

peers (most of whom were male)"). The fact that white social workers were "involved in making

the decision to send [the M]emorandum," (*see* Defs' Reply 10), does not change the

Memorandum's substance and paints an incomplete picture about how and why it was drafted.

Indeed, Plaintiff testified that while she consulted her white colleagues about sending the Memorandum, only black social workers "showed up" to a meeting about drafting the Memorandum itself.  (Pl's Dep. at 113:15–114:18.)  If anything, that circumstance reinforces Plaintiff's view of how the Memorandum should have been perceived.  Taking all those circumstances into account—the racial makeup of the two groups, the preceding grievance, and (to the extent relevant) the social workers who contributed to the Memorandum—a reasonable juror could conclude that the 2016 Memorandum raised discriminatory conduct.  *See Felty*, 2021 WL 860379, at *16; *Van Brunt-Piehler*, 504 F. Supp. 3d at 194; *cf. Lenzi v. Systemax, Inc*., 944 F.3d 97, 113 (2d Cir. 2019) (holding plaintiff satisfied her prima facie burden where an email complaint raised inference of discrimination when "read in context" of other events even though the email "[s]tanding alone . . . may well [have] be[en] insufficient").

Defendants also argue that Plaintiff has failed to demonstrate causation because a two-plus year period separated the protected and retaliatory acts.  Indeed, although the Second Circuit has not set out a "bright-line beyond which a temporal relationship is too attenuated to prove causation," courts in this District routinely hold that gaps "as little as three months"—not to mention two plus years—"are sufficient to thwart an inference of causation."  *Vaughn v. Empire City Casino at Yonkers Raceway*, No. 14-CV-10297, 2017 WL 3017503, at *21 (S.D.N.Y. July 14, 2017) (quoting *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010)).  But Plaintiff correctly points out that she need not rely solely on temporal proximity if the record contains direct "evidence of retaliatory intent."  *Vaughn*, 2017 WL 3017503, at *22 (explaining that such evidence may be "sufficient" "even in the absence of temporal proximity"); *see also Stajic v. City of New York*, 214 F. Supp. 3d 230, 236 (S.D.N.Y. 2016) (holding that even though the temporal gap between the protected activity and adverse action was at least five and a half

months, the plaintiff had "alleged direct evidence of retaliatory animus" sufficient to sustain a

claim). And Plaintiff presents just such evidence here. She testified that, at a 2018 department

meeting, she raised concerns to DePaul regarding her "unbalanced schedule." (Pl's Dep. at

45:10–14.) DePaul purportedly responded: "Well, you know Ms. Gaon is purposely doing your

schedule like that because she is pissed at you for that March 2016 letter that you wrote." (*Id*. at

45:15–19.) Defendants' only response to *this* evidence is that it is inadmissible hearsay within

hearsay. (Defs' Reply 10.) Yet they are wrong on both levels. Hearsay within hearsay, of

course, is admissible provided "each part of the combined statements conforms with a[ hearsay]

exception." Fed. R. Evid. 805. First, as to that initial level of hearsay, DePaul is a defendant in

this Action and her statement is plainly admissible as a party admission under Federal Rule of

Evidence 801(d)(2)(A). Second, the rationale Gaon purportedly related to DePaul would be

admissible hearsay within hearsay, as Gaon's statement would *also* be a party admission—in

other words, a party admission within a party admission. *Bensen v. Am. Ultramar Ltd.*, No. 92-

CV-4420, 1996 WL 422262, at *12 (S.D.N.Y. July 29, 1996) (quotation marks and citation

omitted) (admitting "[a] proffered admission contained within [another] admission"); *cf. United

States v. Gotti*, 644 F. Supp. 370, 375 (E.D.N.Y. 1986) (admitting a coconspirator statement

within a coconspirator statement). Alternatively, the statement would also be admissible hearsay

within hearsay on the theory that both DePaul and Gaon are agents of the District speaking to

matters within the scope of their employment. *See Wilkerson v. Columbus Separate Sch. Dist*.,

985 F.2d 815, 818 n.11 (5th Cir. 1993) (admitting a plaintiff's "deposition testimony that [one

declarant] had told him that [another declarant]" made a racially insensitive comment because

"both [declarants] were agents of the [defendant] school district"); Fed. R. Evid. 801(d)(2)(D)

(statements by a "party's agent or employee on a matter within the scope of that relationship" are

not hearsay). (*See also* DePaul Dep. at 30:13–18 (testifying that both DePaul and Gaon were responsible for, and involved in, Plaintiff's assignments).) To be sure, this evidence is thin. Yet Defendants, so confident in their evidentiary objection, (*see* Defs' Reply 10), present no argument why this is insufficient to raise a dispute of fact as to causation. As it happens, this type of evidence—which "demonstrates a specific link between a materially adverse action and the protected conduct"—is exactly the sort of direct evidence "sufficient to support a finding by a reasonable fact finder" of retaliatory intent, even absent temporal proximity between the two events. *See Banks*, 81 F.4th at 277 (quoting *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019)); *Baldwin v. Goddard Riverside Cmty. Ctr.*, 53 F. Supp. 3d 655, 668 (S.D.N.Y. 2014) ("A plaintiff may show retaliatory intent with direct evidence of retaliatory animus directed against the plaintiff, *or* with circumstantial evidence, including evidence that the protected activity was followed closely by discriminatory treatment[.]" (emphasis added) (quotation marks omitted)), *aff'd*, 615 F. App'x 704 (2d Cir. 2015) (summary order); *cf. Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) (allowing a retaliation claim to proceed despite a three-year delay between plaintiff's first EEOC charge and the adverse employment action). Accordingly, summary judgment is denied as to this claim.

### b. Hamilton & DePaul Complaints

Next is Plaintiff's retaliation claim regarding her complaints about Hamilton and DePaul and the subsequent denial of her accommodation request. (*See* Pl's Mem. 11–15; DePaul Compl.; Hamilton Compl.).) The theory here is that the former (protected) acts were followed closely in time by the latter (retaliatory) act.

Defendants again argue that the complaints do not constitute protected activity because they do not mention race. (*See* Defs' Mem. 20–21.) But here, too, context could give rise to a different interpretation. Each complaint starts by referencing neutral conduct giving rise to

"harassment" and "intimidation." (Hamilton Compl.; DePaul Compl.) Yet each one states that this conduct is a form of "*continued* harassment" following Plaintiff's prior EEOC charge and the instant litigation, both of which involve express claims of racial discrimination. (*See* Hamilton Compl. at 2, 7 (emphasis in original); DePaul Compl. at 2, 7 (emphasis in original).)[20] Although Defendants view that information as "attenuated from the complaint['s substance]," the Court is unable to conclude, as a matter of law, that every reasonable employer would take the same view. Instead, like Plaintiff's claims regarding the 2016 Memorandum, a factfinder may conclude based on context that the Hamilton and DePaul complaints are complaints of discrimination. *See, e.g.*, *Felty*, 2021 WL 860379, at *16 (denying summary judgment on retaliation claim based on prior complaints of discriminatory behavior).[21]

Defendants alternatively argue that summary judgment is proper as to adversity. (*See* Defs' Mem. 21–22.) To be precise, Defendants do not appear to take issue with the idea that denying an accommodation request can constitute an adverse action under some circumstances. *See Kirkland-Hudson I*, 665 F. Supp. 3d at 460–61. They instead argue that there cannot be any adversity because Plaintiff's request was granted. (Defs' Mem. 21.) The facts underlying this claim, however, are disputed. The first layer of dispute relates to the scope of Plaintiff's request. As explained supra Section I.A.5, Plaintiff initially presented four proposed accommodations in her request form: (1) reassignment to work in-person from a single building; (2) continuing her

---

[20] Although this Action had commenced as of December 2021, Plaintiff later filed a Second Amended Complaint adding allegations regarding these two internal complaints. (*See* SAC ¶ 58 (Dkt. No. 59).)

[21] For this reason, the Court need not consider Plaintiff's proffered direct evidence of retaliatory intent. (*See* Pl's Mem. 14.) Although likely up for debate, the Court shares Defendants' skepticism about whether the email Plaintiff cites relates to these events. (*See* Pl's 56.1 ¶ 176 (citing Glass Decl., Ex. 30 (Dkt. No. 115-30)).)

split assignment but updating Plaintiff's office spaces to allow for social distancing and proper ventilation; (3) providing "appropriate PPE supplies"; and (4) allowing Plaintiff to work "100% remote," (Pl's ADA Request at 3). Plaintiff's physician, however, stated that working from "a single location" was "required" and recommended that Plaintiff "work remotely where possible." (*Id.*)[22] The form does not provide guidance about how to reconcile these apparently conflicting statements, hence the dispute about the scope of Plaintiff's request. The second layer of dispute has to do with whether that request, in its totality, was denied. Defendants contend that they granted Plaintiff's options (2) and (3) by furnishing an air purifier and additional PPE supplies. (Defs' 56.1 ¶ 105.) Yet Plaintiff counters in her testimony that, even putting aside her physician's requirements, Defendants did not make her workspace safe for social distancing as requested. (Pl's Dep. at 228:25–230:8.) And she points out that Defendants denied her follow-up request clarifying that what she *really* needed was to "work physically from one location." (*See* Collins Decl., Ex. NNN.) At bottom, then, Defendants' contention that they "granted" Plaintiff's request relies on both a favorable reading of the request's scope *and* a disputed account about whether their response was adequate. The Court cannot resolve either dispute in Defendants' favor in this posture. And it likewise cannot say that no reasonable employee would perceive Defendants' response as non-adverse under the circumstances. *See Vega*, 801 F.3d at 90.

Defendants also briefly contend that Plaintiff has not raised a dispute of fact as to her prima facie case of causation. (See Defs' Mem. 23.) But they do not grapple with the fact that the alleged retaliatory act came a little over a month after Plaintiff sent her internal complaints.

---

[22] The Court notes that the physician's entry on the form post-dates Plaintiff's entry by three days. (*See* Pl's Accommodation Req.)

(*See* DePaul Compl. (dated December 20, 2021); Collins Decl., Ex. MMM (initial January 26, 2022, letter responding to Plaintiff's request); *id*., Ex. OOO (Tiggs' February 1, 2022, email constructively denying Plaintiff's follow-up request) (Dkt. No. 112-67).)  And that time period is within the range that typically gives rise to a prima facie inference of retaliatory intent.  *See Vaughn*, 2017 WL 3017503 at *21 (collecting cases) (noting that gaps of two or more months may defeat an inference of causation); *see also Banks*, 81 F.4th at 277 ("[The Second Circuit] ha[s] previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action.").

Defendants further argue that they had a legitimate justification for denying Plaintiff's request.  (Defs' Mem. 22.)  They explained that the District, across the board, did not offer any employees the option to work "100% from home" at the time, except as provided for by quarantine procedures.  (Defs' Mem. 22.)  And they also pointed out that Plaintiff only worked at one building per day on her split assignment, even though she moved buildings throughout the week.  (Defs' Mem. 22; see also Collins Decl., Ex. OOO at 4).  But that justification is not entirely responsive to Plaintiff's request.  As she eventually clarified, Plaintiff's request—and the condition her physician said was required—was to work from a single location, not to work remotely.  (*See* Pl's 56.1 ¶ 105.)  And the statement that Plaintiff only worked at one building per day arguably is less like a *justification* for denying Plaintiff's quest than an assertion that Plaintiff's request was somehow invalid or unreasonable.[23]

Even assuming that justification is a legitimate one, Plaintiff raises a dispute of fact as to pretext.  First, Defendants' explanation is not entirely consistent.  Indeed, in the email denying Plaintiff's follow-up request, Tiggs appears to admit that Plaintiff could feasibly "change [her]

---

[23] Defendant alludes to this request being "unreasonable" in its brief, (*see* Defs' Mem. 8).

assignment to one of the existing single[-]school assignments." (Collins Decl., Ex. OOO at 4.)

And beyond that, the record contains multiple examples of social workers being assigned to a

single school. (*See, e.g.*, DePaul Dep. at 35:18–36:25 (testifying to three social workers assigned

to single schools).) Second, Plaintiff presents some evidence that Hamilton, DePaul, and Tiggs

shared animus towards her. The relevant communication is a forwarded email chain from

Hamilton to Tiggs in which Hamilton and DePaul make fun of Plaintiff's emails. (*See* Glass

Decl., Ex. 30 (Dkt. No. 115-30).) While Defendants are correct that this is not *direct* evidence of

retaliatory intent, it may be circumstantial evidence of it. Hamilton forwarded the email chain

soon after the exchange about Plaintiff's accommodation request; and the email establishes that

the three Defendants communicated, at least to some extent, about Plaintiff's emails. If nothing

else, this provides what Defendants contend is entirely lacking—evidence linking the relevant

"administrators" together. (*See* Defs' Mem. 23.) Ultimately, there is not much to go on for

either side at these steps of the burden shifting framework: Defendants present a not-well-

articulated justification for their action and Plaintiff responds with limited evidence of pretext.

However, that evidence, coupled with Plaintiff's prima facie case of temporal proximity, is

(barely) enough to survive summary judgment. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d

834, 847 (2d Cir. 2013) (holding that the plaintiff's evidence of defendants' inconsistent

explanations for adverse action against the plaintiff "and the very close temporal proximity

between [the plaintiff's] protected conduct and [the adverse action] are sufficient to create a

triable issue of fact with regard to whether the [non-discriminatory reasons were] a but-for cause

of" the adverse action); *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 655 (S.D.N.Y.

2015) (denying summary judgment where inconsistencies in contemporaneous reports about the

plaintiff's performance along with temporal proximity between protected activity and adverse

action created a triable issue as to whether termination of employee for performance issues was pretext for retaliation); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir.2000) (stating "evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation," may sustain a finding of retaliation).

### 5.  FMLA Retaliation

Finally, the Court considers Plaintiff's claim for FMLA retaliation.  The theory here is that Defendants retaliated against Plaintiff's exercise of her FMLA rights by attempting to hand deliver correspondence several times while she was on leave.  (*See generally* Pl's Mem. 19–20.)

FMLA retaliation claims are analyzed under the three-step burden-shifting analysis set forth in *McDonnell Douglas*.  *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).  "To establish a prima facie case of FMLA retaliation, a plaintiff must establish that 1) [s]he exercised rights protected under the FMLA; 2) [s]he was qualified for his position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (alteration omitted).  For the purposes of FMLA retaliation claims, an "adverse employment action" is "any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her] legal rights."  *Millea v. Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). "Petty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims."  *Id.* at 165 (alteration omitted).  However, where a plaintiff alleges multiple adverse acts, "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."  *Smith v. N. Shore-Long Island Jewish Health Sys.*, 286 F. Supp. 3d 501, 512 (E.D.N.Y. 2018) (quoting *Hicks*, 593 F.3d at 165).  "[T]he standard for an adverse employment

action in retaliation claims is considerably broader than the standard for discrimination claims." *Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926, at *14 (E.D.N.Y. May 24, 2010). Additionally, but-for causation is not required under the FMLA. *See Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 169 (2d Cir. 2017) (holding that a jury instruction of "but[-]for" causation for FMLA retaliation was erroneous). Instead, the Second Circuit has adopted a "negative factor" test—i.e., that the plaintiff's "taking of FMLA leave [was used] as a negative factor in [an] employment action[]." *Id.* (emphasis omitted) (quoting 29 C.F.R. 825.220(c)).[24]

At the outset, the way both sides approach the "exercised-her-FMLA-rights" element of this claim is peculiar, if not illogical. Recall that after Plaintiff's initial FMLA leave request was denied, she requested periods of sick leave on both April 1 and May 4, 2021. Yet Defendants, ignoring Plaintiff's emails stating she *did not want* FMLA leave, granted it anyway on April 14 and May 12, 2021. (*See* Collins Decl., Ex. PP at 1 (April 1 email stating "I will be using my sick days during my absence."); Ex. UU at 1 (May 4 email stating "I will continue to use my sick days); Ex. VV at 1 (May 12 email stating "I want to . . . ensure my absences are being marked as sick days, not FMLA" and "[a]t no point did I resubmit a new request for FMLA").) That alone is perplexing, and as yet unexplained by Defendants. Equally perplexing is Plaintiff's claim that she was somehow exercising her FMLA rights on those dates, again given express statements

---

[24] *Woods* adopted this test by deferring to a Department of Labor interpretation of the FMLA's "prohibited acts" provision, 29 U.S.C. § 2615(a)(1), under the framework set out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Of course, *Chevron* has since been overruled. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Yet while *Chevron* sleeps with the fishes, the Supreme Court clarified that its decision in *Loper Bright* was not meant to "call into question prior cases that relied on the *Chevron* framework" and would not furnish "special justification" for overruling such holdings. *See id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) (internal quotation marks omitted)).

that she *did not want* FMLA leave.  Now, cases do hold that an employee exercises her rights

when she is *on* FMLA leave.  *Kirkland-Hudson I*, 665 F. Supp. 3d at 470 ("Courts have held that

when a plaintiff is granted leave under the FMLA, that plaintiff has exercised rights protected

under the FMLA." (citing inter alia *Carla Ottley-Cousin v. MMC Holdings, Inc*., No. 16-CV-

577, 2019 WL 1994488, at \*17 (E.D.N.Y. May 6, 2019) (holding that a plaintiff "exercised

rights protected under the FMLA when she requested and was granted leave"))).  But the Court

is not aware of any case applying that theory to a situation where the leave itself is unwanted.

Put differently, it is hard to understand how an employer's decision to place an employee on

unwanted FMLA leave constitutes the *employee's* protected activity.

 Even assuming it is, Plaintiff has failed to demonstrate a dispute of fact as to adversity.

Plaintiff's theory here is that the District's attempts to hand-deliver correspondence to her home

were a form of harassment and intimidation.  The visits from the messenger, however—two of

which are depicted via video and therefore undisputed—are entirely unremarkable.  *See*

*Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied upon

by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be

credited by the court.").  Just like mailmen, FedEx messengers, and other delivery workers who

visit residences every day, the District's messenger walked up to Plaintiff's home, rang the bell,

waited a several seconds, made a notation on what looked like a clipboard, walked back to her

vehicle, and left.  (*See* Collins Decl., Ex. SS (Dkt. No. 112-45).)  *See Missel v. County of*

*Monroe*, No. 10-CV-6380, 2011 WL 3648635, at \*4 (W.D.N.Y. Aug. 17, 2011) (holding that,

without more, "plaintiff's allegation that a Deputy Sheriff delivered a letter fails to allege

retaliation").  Contrary to Plaintiff's pleading stage allegations—which she cites in lieu of record

evidence (*see* Pl's Mem. 19)—the messenger did not appear to "driv[e] up and down the street"

or to "pac[e]" in front of Plaintiff's home, (*see id*.).  The thrust of Plaintiff's argument instead seems to be that this was harassment under the circumstances given her mental health conditions and history with the District.  (*See id*. 19–20.)  To be sure, the surrounding circumstances matter, as "[t]he real social impact of [employer] behavior often depends on a constellation of surrounding circumstances . . . not fully captured by a single recitation of the words used or the physical acts performed."  *Burlington* 548 U.S. at 69 (quotation marks omitted).  But in considering the circumstances, courts do so by reference to how "a *reasonable* employee would react rather than to the plaintiff's subjective reaction."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 112 (S.D.N.Y. 2012) (emphasis in original) (citing *Burlington*, 548 U.S. at 67–69).  In other words, "a plaintiff's subjective feelings cannot be used to determine whether an employment action is adverse."  *Jones v. N.Y. City Bd. of Educ*., No. 09-CV-4815, 2012 WL 1116906, at *10 (S.D.N.Y. Apr. 2, 2012) (quoting *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F.Supp.2d 75, 84 (E.D.N.Y.2002)).  And Plaintiff's subjective view that the visits, either individually or in aggregate, were "threatening and unwarranted" is all that stands between her claim and otherwise routine mail delivery practice.  (*See* Pl's Mem. 20.)  That is insufficient, as a matter of law, to sustain a FMLA retaliation claim.  *See Dearden v. GlaxoSmithKline LLC*, No. 15-CV-7628, 2017 WL 4084049, at *8 (S.D.N.Y. Sept. 14, 2017) (explaining that the "reasonable employee" test for FMLA retaliation "does not take into consideration a plaintiff's unusual subjective feelings" (internal quotation marks omitted)); *see also Amley v. Sumitomo Mitsui Banking Corp*., No. 19-CV-3777, 2021 WL 4429784, at *13 (S.D.N.Y. Sept. 27, 2021) (granting summary judgment to defendant on FMLA retaliation claim where plaintiff relied on his own "insist[ence]" that "he was deterred" "as a result of his treatment" to establish an adverse action); *cf. Walder v. White Plains Bd. of Educ*., 738 F. Supp. 2d 483, 500 (S.D.N.Y. 2010)

(granting summary judgment because "[the plaintiff's] allegation of adverse actions amount[ed] merely to her own belief that she was treated unfairly").

Finally, to the extent Defendants were harassing Plaintiff, Plaintiff offers no theory why this activity would dissuade a reasonable employee *from exercising her FMLA rights*. Indeed, the two communications the messenger was attempting to deliver were one letter explaining how Plaintiff could extend her FMLA leave (the April 14 letter) and another granting that leave (the May 12 letter). Put differently, the purported retaliatory acts were part of Defendants' effort to grant Plaintiff the very leave she claims they retaliated against—leave she never asked for in the first place. If that sounds odd, it is. And it is not a course of conduct that would deter a reasonable employee from seeking or remaining on leave.

Accordingly, Defendants are entitled to summary judgment on this claim.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Specifically, the Court grants summary judgment to Defendants on Plaintiff's hostile environment claim arising out of the May and September 2020 disciplinary memoranda and Plaintiff's FMLA retaliation claim. Additionally, all state law claims against the District are dismissed. The Court denies summary judgment on all other claims. The Court will hold a telephonic status conference on October 25, 2024, at 11:30 AM.

SO ORDERED.

Dated:    September 23, 2024
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge